Grange Trust, William Wharton Smith, Henry Austin Wood, Jr., Benjamin Smith Wood, and Edward Wanton Smith, Jr., Trustees, v. Commissioner.
Grange Trust v. Commissioner
Docket No. 111169.
United States Tax Court
1945 Tax Ct. Memo LEXIS 232; 4 T.C.M. (CCH) 400; T.C.M. (RIA) 45136; April 17, 1945
Sanford D. Beecher, Esq., for the petitioner. Paul E. Waring, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge.: This proceeding involves deficiencies in income, excess profits, and declared value excess profits taxes for the calendar years 1936 to 1939, inclusive, as follows: Declared Value
Excess Profits
Excess
Year
Income Tax
Tax
Profits Tax
1936
$5,079.92
$2,661.93
1937
3,584.75
2,369.65
1938
4,107.41
3,657.28
1939
2,563.59
$2,570.06
The principal issue is whether a trust, of which the petitioners named in the caption are trustees, is an association taxable as a corporation. In the event it is determined to be so taxable then the following questions must be determined: (1) Had the period of limitation upon the assessment and collection of additional taxes for the taxable period terminating December 31, 1936, expired prior to the *234 determination of the deficiency? If this question is answered in the negative it becomes necessary to decide whether $17,236.69, accrued upon the books of the trust as taxes payable to the city of Philadelphia, is deductible as taxes or represented a capital investment of the trust. (2) Were "Capital Stock Tax Returns," filed by the trustees of the trust with the collector of internal revenue on September 29, 1943, valid returns for the several periods within the meaning of the applicable statutes? (3) Is the trust subject to undistributed profits tax for the years 1936 and 1937? and (4) Is the trust entitled to a larger dividends paid credit than the respondent has allowed? The basic facts are not in dispute. By this reference all of the facts set out in the stipulation of the parties are found to be as stipulated. [1] Others shown in our findings are based upon evidence adduced at the trial. *235 Findings of Fact The individuals named in the caption are trustees under a deed of trust executed May 11, 1936. Their office is at 910 Girard Trust Bldg., Philadelphia, Pa. They filed timely fiduciary returns of income (Form 1041) on an accrual basis for each of the taxable periods with the collector of internal revenue at Philadelphia, Pa. Hereinafter the petitioners will be referred to in the singular or as the trust or "Grange Trust." The property conveyed to the trust consisted of undivided fractional interests, held by the grantors as tenants in common, in six tracts of real estate in the city of Philadelphia. The six tracts aggregated 7.526 acres. The eleven (11) grantors collectively owned 4321/6300 of tracts 1, 2 and 3, all of tract 4 and 29/30 of tracts 5 and 6. Edward Wanton Smith and Francis R. Taylor held the title to the other 1/30 of tracts 5 and 6 as trustees for Edward Wanton Smith, Jr. The remaining interests in tracts 1, 2 and 3 (1979/6300) were held by 20 individuals and trustees in fractional parts ranging from 21/5040 to 1/20th. All of the owners were direct descendants of John Morton, who died in 1828. The grantors of the property to the trust were direct *236 descendants of Benjamin R. Smith, who died, a resident of Philadelphia, on April 3, 1904. The six tracts of real estate conveyed to the trust were portions of two larger tracts, one originally containing approximately 80.457 acres and the other containing approximately 14.959 acres, a total of 95.416 acres, known as Grange Farm. "In 1912 the owners of the entire two tracts and their respective interests therein were as follows: [2]
146/210
Edward Wanton Smith and Francis R.
Taylor, Succeeding Trustees u/w Ben-
jamin R. Smith, Dec'd (grandson of
John Morton)
3/210
W. Marriott Canby and Security Trust
& Savings Deposit Co., Successor Trus-
tees u/w Mary W. Dillon, Dec'd (grand-
daughter of John Morton)
1/20
Margaret Morton Riley (granddaughter
of John Morton) - (Lewis A. Riley her
husband)
3/140
Provident Life & Trust Co., Trustee
u/w Frances Morton Drinker (grand-
daughter of John Morton)
1/20
Provident Life & Trust Co., Executor
& Trustee u/w Edmund H. McCullough
(husband of Anna L., granddaughter of
John Morton)
3/140
Frances Morton Rosengarten (great
granddaughter of John Morton) -
(Mitchell G. Rosengarten her husband)
1/70
Esther F. W. Smith, Widow of Ben-
jamin R. Smith (grandson of John
Morton)."
*237 From 1912 through December 31, 1928, the owners of Grand Farm sold and otherwise disposed of portions thereof as follows: Acres
Date Sold
Purchasers, Improvements
Price
1.1990
1912
School Dist.
$ 9,592.00
.5393
1913
Katherine H. Hope
3,775.00
1.0850
1913
City of Phila. (Street)
6,500.00
.4926
1914
P. & R.R.R. (Station)
3,210.90
8.787
1915
E. S. Radley (91 Houses)
103,247.25
1915
City for Street
10,660.26
4.3841
1917
D. H. Redmond (82 Houses)
35,072.80
1918
City (Street) (Conveyed)
.2708
1918
Bd. Home Missions on Reformed Church (Church)
9,000.00
1.287
1919
Harry Brockelhurst (for Jewish Hospital Ass'n)
18,000.00
1.327
1920
City - Condemnation (Street)
14,225.00
1.3179
1920
Phila. Rapid Transit Co.
50,000.00
1920
Conveyed to City of Phila. for street bids
8.2978
1920
Daniel Crawford (Constructed 241 Houses)
173,408.00
.035
1921
Conveyed to City for Street
.317
1922
Conrad Zitzer (7 Houses)
10,000.00
Footage
1923
Conveyed to City for Streets
6.175
1923
Harry Collins (72 Houses)
78,000.76
11.0083
1923
Morris Fleishman (192 Houses)
88,066.40
7.326
1923
Collins & Halloway (48 Houses)
109,002.00
Footage
1924
City - (Widening Street)
3,724.09
14.9911
1924
Harry P. Collins (107 Houses)
218,870.85
.3587
1926
Conveyed to City (Subway Adm. Bldg.)
4.592
1927
City of Phila. (Car Barn and Subway Repair Shop)
52,481.05
.018
1928
Conveyed to City
5.583
1928
David Burpee
114,301.00
*238 The land remaining unsold on December 31, 1928, consisted only of the six tracts above referred to. During 1922 an offer of $200,000 to purchase tracts 4, 5 and 6 had been received by Edward Wanton Smith, who represented the Smith interests aggregating 149/210ths. Smith wished to sell; but the owners of the remaining 61/210ths interest refused to do so at that price. In 1923 Smith and his sisters purchased the minority interests in order to facilitate sale or improvement of the tracts. During the years 1928-1929 there had been constructed by the Philadelphia Rapid Transit Company, upon land owned by the descendants of Morton and Smith, a combination subway, surface street car and bus terminal at a cost of $105,000. Subsequently, from 1935 to 1939 stores in the terminal building were constructed at a cost of approximately $10,000. This terminal is at the intersection of Broad Street and Olney Avenue, and, during the years 1936 to 1939, street cars and bus lines operating from it served a territory of approximately *239 20 square miles. The number of persons entering and departing from the terminal were as follows: Number of
Year
Persons
1936
8,883,311
1937
9,925,281
1938
9,758,680
1939
10,509.490
On July 10, 1929, Edward Wanton Smith, Esther Morton Smith and Anna Wharton Wood, owners of tracts 4, 5 and 6, filed a certificate with the Prothonotary of Philadelphia County and with the Secretary of the Commonwealth of Pennsylvania under the Pennsylvania Fictitious Names Act, which required parties doing business under a fictitious name to file a certificate showing the real parties in interest. The certificate stated that the name under which the business was being conducted was "Grange Development". Thereafter, as the parties in interest were changed, appropriate notices were filed and new certificates were issued. Edward Wanton Smith, Esther Morton Smith and Anna Wharton Wood endeavored to sell the tracts without any improvements thereon but were unsuccessful. In 1928, at their direction, a printed circular was prepared, describing the advantages of the lots for building sites and offering them for sale or long term lease-hold. The circulars were given wide distribution *240 among real estate men, trust companies and individual investors in Philadelphia and adjacent territory; but no sale resulted. Benjamin R. Smith, who died in 1904, left an estate of approximately $130,000. The income from the estate was used principally in paying the taxes on Grange Farm until about 1938. In 1932 Esther Morton Smith desired to obtain the income from her father's estate for her own purposes. She had no children; but she had nephews and nieces. In 1932 she conveyed all her right. title and interest in tracts 2 and 3 to her ten nieces and nephews. Later she conveyed all of her interest in the other tracts to the same parties - Tract 1 in 1933, Tract 6 in 1935 and Tract 5 in 1936. During 1929 and 1930 Edward Wanton Smith and his two sisters, Esther Morton Smith and Anna Wharton Wood, having failed in their efforts to sell the unimproved tracts, erected a two-story store and office building on tract 4 at a cost of $139,492.61. It contained nine stores facing Olney Avenue, eight facing Broad Street and one at the intersection of Broad and Olney. The office building contained ten offices. It was financed by a bond and mortgage on tract 4 in the amount of $150,000. The *241 building was erected at the lowest possible cost consistent with the neighborhood and served to aid in defraying the carrying charges, which had become burdensome. It is what might be termed a "taxpayer", - a building erected at a minimum cost to aid in paying taxes - rather than an ultimate improvement, i.e., a structure intended to produce the greatest possible revenue over a long period of years. In 1932 the owners of tract 6 erected a one-story brick building at the corner of Broad and Chew Streets at a cost of $54,202.94, which was immediately leased to the Great Atlantic & Pacific Tea Co. In 1933 a one-story brick building adjacent thereto was erected at a cost of $26,926.82 and immediately leased to S. S. Kresge Company. In 1934 an additional one-story brick building adjacent to the Kresge store was erected at a cost of $24,216.77, which was immediately leased to Warner Brothers Theatre, Inc. and other tenants. The construction of the several buildings was financed by bonds and mortgages on tract 6, $50,000 being borrowed in 1932, $25,000 in 1933 and $25,000 in 1934. In 1934 and 1935 the owners of tract 5 constructed a one-story brick building thereon fronting on Broad Street *242 adjacent to the north of the theatre building at a cost of $28,462.41. In 1935 and 1936 they constructed a one-story brick building thirty feet to the north and also fronting on Broad Street at a cost of $26,500. In 1936 they constructed another one-story brick building adjacent to the last one built also fronting on Broad Street at a cost of $50,624.95. The construction of these structures was also financed by mortgages and the buildings were leased to retail merchants. In April 1936, prior to the execution of the trust, construction was started on a two-story apartment house project of five units of four apartments each at the southwest corner of Park and Grange Avenues on tract 5. It was completed in October 1936 at a cost of $50,000. It was financed after the trust was executed by a loan from an insurance company, secured by a mortgage on the property. This structure was of the ultimate improvement type. There were two large hospitals in the vicinity and it was thought the units could be readily sold to doctors for combined office and living quarters and financed by the Federal Housing Administration. However the F.H.A. would not underwrite that type of construction at that time. *243 After completion, a sample apartment was exhibited and two salesmen were kept there for several months trying to sell the units; but there was no market for them. The fractional interests of the 11 grantors referred to early in these findings (4321/6300ths in Tracts 1, 2 and 3, all of Tract 4 and 29/30ths of Tracts 5 and 6) were conveyed to the trust in fee simple on May 11, 1936, but "* * * IN TRUST, nevertheless, to sell, convey and convert said real estate into cash, from time to time, as said Trustees, in their absolute discretion, may deem best for the interest of the Trust estate; it being the express intention and agreement of the parties hereto that the interests of the Grantors conveyed herein, shall hereafter be considered, during the continuance of the Trust hereby created, as interests in the net income and in the net proceeds of any sales made by said Trustees; and that neither the grantors, nor their heirs, executors, administrators or assigns, shall have any rights in said real estate other than the rights limited and defined by the provisions of this Deed of Trust, in harmony with said intention and agreement." The purposes of the trust and the powers of the trustees *244 as set forth in the deed of trust are as follows: "1. To sell in fee simple or for any less estate, free and clear of trusts,ts, any part or all of the premises hereby conveyed, or any fractional interest therein, of which they are vested hereby, for such price or prices, and upon such terms and subject to such conditions and restrictions, as to them may, at any given time, seem, meet and proper, upon mortgage, purchase money mortgage, or by reservation of ground rent or for cash, as the case may be, and for the effectuation of the same, to execute, acknowledge and deliver good and sufficient deeds, or any other acquittances in the law, for the same without any liability or obligation on the part of the purchasers or mortgagees to see to the application of the purchase or mortgage money. "2. If necessary or desirable, in the sound discretion of the Trustees, to purchase or rent additional contiguous or adjacent land; or other fractional interests in 'Grange Farm' not included in this conveyance; or to square lines by equitable exchange of realty, with adjoining property holders or in any and every way to improve and develop, in configuration, contour and shape, the premises hereby *245 conveyed, or any interest therein or part thereof. "3. To borrow, by mortgage or other encumbrance by lien of record on any part or all of the premises hereby conveyed, or by temporary obligation on the general credit of the trust estate. "4. To manage, develop and administer the said premises either in part or as a whole, in their discretion, for the production of income; to erect thereupon any buildings, of what kind soever, lawfully appropriate for said premises, and the same to demolish and remove, and to rebuild, in their discretion; to lease and let, or operate the same as a proprietary project, as circumstances shall warrant. "5. To appoint or designate one or more agents, under them, by instrument in writing and to delegate to said agent or agents, any specific administrative powers hereby vested in said Trustees, except only the exercise of discretion as to the major objects of this trust, including the discretion to be exercised in the sale, purchase, letting, partition and/or acquisition, mortgaging, encumbering of land and the distribution of proceeds arising from either capital or income sources. "6. To rent and let the said premises or any part thereof for terms *246 (not exceeding, in length, a period of ten years beyond the expiration of this trust) upon conditions solely within their discretion and to collect, recover, sue and distrain for all rentals so to fall due; to pay and requite, from said avails and proceeds (or if necessary, from borrowing upon mortgage, judgment note or general credit) all the debits of administration, - including inter alia, taxes (excepting Inheritance or Succession taxes, if any, assessed against the equitable estate of any beneficiary hereunder) interest on encumbrances, insurance premiums, water or sewer charges, wages, commissions, expense for repairs and maintenance, and all other similar items; to keep accurate accounts of the administration of said premises, with due distinction between capital and income items and with maintenance of sufficient reserves for depreciation and "(a) from funds derived from sales or other capital sources, to use part or all, in the discretion of the Trustees, for development, construction or re-construction purposes on the premises or on other realty to be acquired under the terms hereof; or for the reduction, refunding or payment of any or all of the floating or funded and *247 lien encumbrances against any part of or interest in said premises, or premises to be acquired; or eventually, for distribution among the beneficiaries, and "(b) from the annual net income or avails, to apply, without discretion, at least one-half (1/2) thereof for the payment or amortization of any funded or lien indebtedness outstanding; and, in the exercise of their discretion, to apply all or part of the remaining one-half (1/2) for the same purpose, - the Trustees, in the exercise of such discretion, to be governed by the wisdom of eliminating indebtedness and by the primary purpose of this trust, namely, - the orderly and unhurried development and distribution among the beneficiaries, of the trust res, and only incidentally the accumulation of principal funds to be held by said Trustees, to further and accomplish the primary purpose. "The deed of trust also provides: "8. The term for which the Trust hereby created is to exist shall be for twenty-one years from and after the death of the survivor of the presently existing issue of Benjamin R. Smith, progenitor of all of the Grantors herein (excepting spouses) - subject to the following provisos, - "(a) The Trust shall *248 terminate automatically as to all of the trust res or corpus hereby conveyed, which shall, during any part of said term, be ratably distributed among the beneficiaries. "(b) At the end of said term, the entire Trust shall terminate, and the trust res or corpus, shall vest. "9. The Trustees herein designated, and their successors, to be appointed in accordance with the terms hereof, are expressly authorized and empowered to acquire title to and accept conveyances hereafter, of any additional fractional interests in the tracts hereby conveyed, known respectively as 'Grange Farm' and 'Grange Development', subject to terms of trust identical with those herein expressed, and to administer said additional fractional interests in accordance with the terms hereof, said additional fractional, beneficial or equitable interests, thus to be created by said prospective conveyances, to be merged, under the trust provisions herein set forth, proportionately with all the other beneficial interests hereunder. * * * * * "12. It being the desire of the Grantors that the equitable estates hereby created shall be retained as closely as may be feasible by and among the issue of Benjamin R. Smith, *249 aforesaid, no sale, conveyance or assignment of any beneficial or equitable interest hereunder shall be made by any present or future beneficiary under the terms of this trust, to any person, corporation or individual not a lineal descendant of Benjamin R. Smith, aforesaid, unless and until it shall appear that none of the issue of said Benjamin R. Smith desire so to take upon terms equally advantageous to those offered by any third party, which fact, in any such conveyance, shall be ascertained by the joinder therein of at least a majority of the then subsisting Trustees who shall so certify." On June 8, 1938, the trust purchased the outstanding 61/210 interest held by the collateral relatives in tract 1 for $17,130.73. The minority interests were represented by seven trust companies or fiduciaries and they had refused to improve the tract in any way. The purchase was to facilitate the improvement and sale of the property. After the purchase a two-story brick building was erected on tract 1 containing six units for retail stores with second floor apartments. The building was completed in December, 1938, at a cost of $40,800. Four of the units were sold in 1938 for a total price *250 of $49,000. Efforts were made to sell the two remaining units but without success. In July 1938 a brick building was commenced at the southwest corner of Olney Avenue and Thirteenth Street, to be used as a United States Post Office. It was completed in November 1938 at a cost of $26,500 and immediately leased to the United States. The post office was a neighborhood asset and it was thought that it would help to develop the tract and aid in the sale of the stores. It was planned to build three additional stores on lots adjacent to the post office when those built had been sold. The six store buildings and the post office referred to above were the only buildings erected by the trust between the time it was established and December 31, 1939. Other expenditures of a capital nature were made during this period, by way of repairs and improvements to buildings constructed before the trust was formed, as follows: Tract 4
Tract 5 and 6
5/11/36-12/31/36
$ 738.44
None
1937
6,575.84
$ 1,624.95
1938
None
37,822.86
1939
14,163.87
3,201.82
21,478.15
42,649.63
21,478.15
Total
$64,127.78
The improvements on lots 5 and 6 consisted principally of *251 enlarging the theatre building, which resulted in a more favorable rental agreement being secured. No expenditures of a capital nature were made during this period with respect to tracts 2 and 3, which remained unimproved. The gross income, expense, and profit or loss for the years 1931 to 1935 inclusive from the six tracts were as follows: Gross Income
Expense
Loss
Tracts
Tracts
Tracts
Tracts
Tracts 1, 2,
Year
1, 2 and 3
4, 5 and 6
1, 2 and 3
4, 5 and 6
3, 4, 5 and 6
1931
$3,158.81
$ 34,616.67
$10,799.00
$ 50,155.10
$23,178.62
1932
2,070.42
35,356.61
10,758.51
52,890.32
26,221.80
1933
1,335.68
47,351.75
9,936.68
57,516.25
18,765.50
1934
1,191.71
50,106.45
8,644.59
63,918.62
21,265.05
1935
1,100.04
62,335.60
6,350.46
67,647.47
10,562.29
$8,856.66
$229,767.08
$46,489.24
$292,127.76
$99,993.26 No depreciation is included in the above schedule for the years 1931 to 1933 inclusive, 1934 includes depreciation on Tract 4 only. The improved tracts - Nos. 4, 5, and 6, for the four years and tract No. 1 for 1938 and 1939 - show a profit for the years 1936 to 1939, inclusive, as follows: Year
Profit or Loss
Percentages
1936
$ 2,066.25 Profit
.0049 Profit
1937
21,542.45 Profit
.0513 Profit
1938
22,906.34 Profit
.0460 Profit
1939
24,077.94 Profit
.0467 Profit
*252 Appropriate charge-off for depreciation had been made and is not included in the profit shown above. Both prior and subsequent to May 11, 1936, the method of handling the improved tracts was substantially as follows: "(a) All leases were initiated and negotiated by a real estate broker, whose office is located on tract 4. "(b) The broker executed, as agent, all leases for a term of less than three years. "(c) All rentals were payable to the broker at his office. "(d) From the rentals collected, the broker paid all expenses incident to maintaining the premises, such as heat, light, supplies, janitor service, repairs, water, commissions, etc. The balance was remitted monthly to Edward Wanton Smith, together with statements showing the receipts and disbursements. "(e) The amounts received monthly by Smith were deposited by him in the bank accounts maintained for 'Grange Development' and from these accounts he paid the mortgage interest, mortgage principal reductions, real estate taxes and insurance premiums. "(f) All enlargements, alterations and renovations were made by the broker and paid for by check drawn on the bank accounts maintained for 'Grange Development,' such *253 payments being made upon the presentation of a statement by the broker to Smith, which set forth the expenditures incurred. "(g) From the monthly statements prepared by the broker and from the information contained in the check books of 'Grange Development,' the office of Francis R. Taylor, as attorney for the owners, made summaries thereof in the books of account maintained for Grange Development and prepared annual statements showing the results." Prior to May 11, 1936, leases for terms of three years or more were executed by Edward Wanton Smith and Francis R. Taylor for the owners under powers of attorney. After May 11, 1936, such leases were executed by the trustees. With this exception, no change in the method of handling the properties occurred as a result of the creation of the trust. At the time of the establishment of the trust all improvemens on the properties were under lease. There were in effect forty such leases, seven of which had been for an original period of ten years. The remaining leases were for lesser terms, the majority being for three years or less. From May 11, 1936, to December 31, 1939, the leases entered into were in practically all instances renewals *254 of existing leases for terms varying from month to month to from one to five years, with the exception of the lease for the Post Office which was for a term of ten years from December 1, 1938. No capital outlay was made by the equitable owners of the property from their personal funds. The improvements were made from income, capital derived from sales, and borrowed funds, secured by mortgages. Prior to 1929 no formal books of account were maintained with respect to any of the properties. During that period the only record of transactions affecting them were check books and bank statements. In 1929 books of account were opened for the improved tracts, the first entries therein being as of June 14, 1929. Thereafter separate books of account were maintained for the improved tracts under the name "Grange Development," the first tract placed on the books being tract No. 4. Tracts Nos. 5, 6 and 1 were placed on the books as developments were started thereon. At first these accounts represented only the cost of construction and the result of operation; but subsequently, on May 11, 1936, the appraised value of the land comprising tracts 4, 5 and 6, was placed upon the books in an account *255 designated real estate. Tract No. 1 was placed in the real estate account of "Grange Development" when the minority interests in that tract were acquired in 1938. Both before and after 1929, when the books of account for "Grange Development" were opened, records of receipts and disbursements with respect to tracts 1, 2 and 3 were handled through a bank account in the name of "Francis R. Taylor, Attorney for Owners of Grange Farm." Bank accounts for tracts 4, 5 and 6 were handled differently because these tracts were owned entirely by the Smith interests while 61/210ths undivided interests of tracts 1, 2 and 3 were owned by collateral relatives. Prior to 1930 no fiduciary or information returns were filed by Grange Farm or Grange Development. The owners of the respective undivided interests received from Francis R. Taylor, in whose office the records and accounts were maintained, a statement showing the share of each in the profit and loss and in the capital distributions. During this period the internal revenue agents had to come to Taylor's office to check the returns of the owners of the respective interests. In order to avoid this procedure it was suggested that some kind of *256 an information return be filed. Accordingly partnership returns were filed by Taylor with the collector of internal revenue at Philadelphia, Pennsylvania, for the years 1930, 1931, 1933, 1934 and 1935. For the period January 1, 1936, to March 16, 1936, a partnership return for "Grange Development" was filed on March 15, 1937, for tracts Nos. 4 and 5 showing gross income of $12,409.84 and deductions of $12,455.75, including taxes in the amount of $4,576.91. The net income shown by the return was a minus quantity in the amount of $45.91. For the same period a partnership return was filed for tract No. 6 showing gross income of $2,856.86 and deductions totaling $3,222.24, including taxes in the amount of $1,187.46, or a net loss of $365.38. On March 15, 1937, partnership returns were filed for the period March 17, 1936, to May 11, 1936, for tracts Nos. 5 and 6 showing gross income of $5,928.70 and deductions totaling $6,250.60, including taxes in the amount of $2,471.57, or a net loss of $321.90. For the same period a partnership return was filed for tract No. 4 showing gross income of $5,318.48 and deductions totaling $5,299.62, including taxes in the amount of $1,775.12, or net income *257 of $18.86. The total income and deductions on tracts Nos. 1, 2 and 3 were not included on any of these returns. The reason for the two periods was the change in ownership as shown above. On March 15, 1937, a fiduciary return of income for the period May 12, 1936, to December 31, 1936, was filed for "Grange Development, Tract No. 4" upon which was reported gross income from rents in the amount of $22,648.76 and net profit in the amount of $13,638.62. Deductions were claimed of interest paid $5,205.54 and taxes $7,204.94, or a total of $12,410.48, leaving net income of $1,228.14. For the same period a fiduciary return was filed for "Grange Development, Tracts 5 and 6," upon which was reported gross income from rents in the amount of $32,049.98 and net profits in the amount of $19,750.20. Deductions were claimed for interest paid $8,166.01 and taxes $10,031.75, or a total of $18,197.76, leaving net income in the amount of $1,552.44. No fiduciary or information returns for this period were filed showing the income and deductions from tracts 1, 2 and 3. The gross income from these tracts for the year was $1,931.51 and the portion properly includible in the income of the trust was $1,370.45. *258 Following the practice, theretofore existing, the income from these tracts was credited to the owners and included in their respective returns. In 1928 the owners had sold a tract of ground comprising approximately 5 1/2 acres to David Burpee, taking a purchase money mortgage of $80,000. They owned this mortgage in the same proportions that they had owned the tract of ground. The balance unpaid on the mortgage at the time of the creation of the trust was $75,000. This mortgage was not transferred to the trust. During the year 1936 the sum of $4,500 was paid by the mortgagor as interest. Appropriate accounting was made by Taylor and the owners. In determining the deficiency in tax the Commissioner took the view that 149/210ths of the aggregate payment, or $3,192.89, constituted income of the trust and should have been included in its gross income. He accordingly added this amount plus $1,370.45 shown in the preceding paragraph to the gross income of the trust for the period May 12, 1936, to December 31, 1936. The gross rentals received from "Grange Development" during the period 1936 to 1939, inclusive, were as follows: Tracts Nos.
Tract No. 4
5 and 6
Broad
Broad
and Olney
and Chew
Tract No. 1
to Broad
to Broad
Apartment
Post Office
Total Gross
Year
and Chew
and Grange
Building
and Parking
Rentals
1936
$35,186.44
$42,946.18
$ 3,080.00
$ 81,212.62 *
1937
37,790.70
52,645.71
11,417.00
101,853.41
1938
39,138.94
54,201.05
11,813.00
$ 900.53
106,053.52
1939
38,227.82
55,080.15
9,556.50
5,624.64
108,489.11
*259 On September 9, 1936, the trustees filed a certificate under the Fictitious Names Act of Pennsylvania in which it was stated, among other things, that the name under which the business is being conducted is "Grange Development" and the character of the business to be carried on is "development, management of real estate near Broad Street and Grange Avenue, Philadelphia, Pennsylvania." Timely fiduciary returns for the calendar years 1937, 1938 and 1939 were filed by the trustees. Each included the profit or loss from the trust's interest in the six tracts and showed the amount of net income distributable to the beneficiaries. The amounts were: for 1937, $19,483.28; for 1938, $21,052.74; and for 1939, $21,417.13. The number of beneficiaries were twelve in 1937 and eleven in 1938 and 1939. The change in the number of beneficiaries was occasioned by Esther Morton Smith, conveying her interest in tract No. 4 to her ten nieces and nephews, these being the same nieces and nephews to whom she had previously conveyed her interest in tracts Nos. 1, 2, 3, 5 and 6. The conveyance was made August 30, 1937, by deed recorded in the office of the Recorder of Deeds of Philadelphia *260 County. A consent or waiver extending the period of limitations upon assessment and collection of income and excess profits taxes for the year 1936 to June 30, 1942, was filed with the Commissioner of Internal Revenue March 3, 1941. The following is a statement of petitioner's mortgage indebtedness from May 11, 1936 to December 31, 1939: 1936
Outstanding May 11, 1936
$308,000.00
Addition during 1936
$95,000.00
Reduction during 1936
1,500.00
93,500.00
Indebtedness Dec. 31, 1936
$401,500.00
1937
Indebtedness Jan. 1, 1937
$401,500.00
Addition in 1937
$52,000.00
Reduction in 1937
10,350.00
Net Increase in 1937
41,650.00
Indebtedness Dec. 31, 1937
$443,150.00
1938
Indebtedness Jan. 1, 1938
$443,150.00
Reduction in 1938
13,850.00
Indebtedness Dec. 31, 1938
$429,300.00
1939
Indebtedness Jan. 1, 1939
$429,300.00
Reduction in 1939
17,350.00
Indebtedness Dec. 31, 1939
$411,950.00
In the notice of deficiency no dividends paid credit was allowed for 1936. For the year 1937 a dividends paid credit of $3,000 was allowed in computing the undistributed net income subject to surtax, this being the amount distributed *261 to the beneficiaries in that year. On September 29, 1943, petitioner filed with the collector of internal revenue at Philadelphia, Pennsylvania, capital stock tax returns on form 707 for the fiscal years ending June 30, 1936, to June 30, 1939, inclusive, and reported thereon "Declared Value of Entire Capital Stock" as follows: Fiscal Year
Declared Value
June 30, 1936
$221,827.90
June 30, 1937
241,230.11
June 30, 1938
304,773.00
June 30, 1939
314,197.66
Upon each of these returns petitioner claimed exemption from corporation taxes on the ground that it was a Trust not doing business." The amount of capital stock tax due and payable on the declared value reported was not shown on any of the returns filed and no capital stock tax was paid. The following schedule was attached to each of the capital stock tax returns filed by petitioner: 1936 Capital Stock Tax Return - Schedule 1 "5. Nature of business in detail: The purpose of Grange Trust as set forth in Deed of Trust of May 11, 1936, recorded in the Office of the Recorder of Deeds at Philadelphia in Deed Book D.W.H. No. 110, page 301, is 'the orderly and unhurried development and distribution among *262 the beneficiaries, of the trust res, and only incidentally the accumulation of principal funds to be held by said Trustees, to further and accomplish the primary purpose.'" "9. Exemptions: Grange Trust was established by Deed of Trust executed under date of May 11, 1936, and recorded as aforesaid. By said Deed of Trust eleven individual grantors conveyed their respective undivided fractional interests in certain tracts of real estate located in the City of Philadelphia in trust, as aforesaid, for the primary purpose of 'the orderly and unhurried development and distribution among the beneficiaries, of the trust res, and only incidentally the accumulation of principal funds to be held by said Trustees, to further and accomplish the primary purpose'. It is claimed by the Commissioner of Internal Revenue that for the year 1936 Grange Trust is subject to corporation taxes, including declared value excess profits tax, as an association. It is claimed by Grange Trust that it is not liable for federal corporation income taxes including declared value excess profits tax nor capital stock tax on the grounds that (1) it is not a corporation and is not an association subject to corporation *263 taxes, and/or (2) it is not engaged in any business. "The status of Grange Trust for purposes of these taxes is now awaiting determination in a case pending in the Tax Court of the United States cited as Grange Trust v. Commissioner of Internal Revenue, Docket No. 111169. "This capital stock tax return is filed by Grange Trust without prejudice to its contentions made in the cited proceeding that it is not liable for federal corporation taxes and that it is not liable for federal capital stock tax. This return is filed for the purpose of fixing the declared value of the capital stock in the event that the pending litigation should determine Grange Trust to be liable for federal corporation taxes as an association. "Request is made that assessment of deficiency be deferred pending the outcome of the above cited litigation." No declared value of capital stock was allowed by the Commissioner in determining the credit to be used in computing income subject to the excess profits tax (or the declared value excess profits tax) for the years 1936 to 1939, inclusive. Opinion As indicated at the outset, the respondent has determined that the trust is an association taxable as a corporation *264 under section 3797 (a) (3) I.R.C. He contends that it has all the characteristics referred to by the Supreme Court in Morrissey v. Commissioner, 296 U.S. 344. Petitioner contends that th trust is an ordinary trust, formed for the purpose of conserving and liquidating real property, its sole asset, and distributing the proceeds among its beneficiaries. It is pointed out that the stated purpose is: "The orderly and unhurried development and distribution among the beneficiaries of the trust res, and only incidentally the accumulation of principal funds to be held by said trustees to further and accomplish the primary purpose". The other purposes, powers and conditions set out in the trust instrument are said to be merely in aid of, and necessary to accomplish the main purpose, i.e. liquidation of the trust res. Petitioner's argument is appealing; for indubitably the ultimate purpose is the liquidation of the trust res and the distribution of the proceeds among the beneficiaries. But the mere existence of such an ultimate purpose is not decisive. Notwithstanding its existence, a trust may have the essential characteristics of an association and *265 be engaged in carrying on a business for profit. If so, it is taxable as a corporation under the revenue laws. Where trustees merely hold title to property, collect the income and distribute it to beneficiaries the trust is not engaged in business and is not taxable as an association. Cf. Lewis & Co. v. Commissioner, 301 U.S. 385. If, however, the organization of the trust, the powers of its trustees and its business activities are more akin to a corporation than to a pure trust it must be regarded as an association. Morrissey v. Commissioner, supra; Marshall's Heirs v. Commissioner, 111 Fed. (2d) 935. As shown in our findings all the grantors in the deed of trust were direct descendants of Benjamin R. Smith, who, at the time of his death in 1904, owned a 146/210 undivided interest in two tracts of land totaling approximately 95.416 acres known as Grange Farm. Upon his death his interest passed to his three children, subject to a life estate in his widow, who, in 1911, purchased an additional 3/210 interest in the farm. At the death of the widow in 1915 the Smith interest, then totaling 149/210, passed to the three children. From 1912 to *266 December 31, 1928, the owners of Grange Farm sold to purchasers or conveyed to the city of Philadelphia for streets and other purposes approximately 87.89 acres. On the parcels sold many permanent improvements were made. 842 houses, a school building, a hospital, a church, a bus and street car terminal building of the Philadelphia Rapid Transit Co., a subway administration building and a car barn and subway repair shop were constructed. On December 31, 1928, there remained of the original Grange Farm approximately 7.526 acres, which was divided into six tracts known as tracts Nos. 1, 2, 3, 4, 5 and 6, all unimproved. Preceding that date there had been distributed among the owners of fractional interests, principal in the total amount of $1,092,123.58. The assessed value of the property remaining unsold in 1929 was $1,562,000 and the taxes were upwards of $44,000 per annum. The owners were unable to sell the land at the assessed value and the carrying charges had become burdensome. They decided to improve three of the tracts - 4, 5 and 6 - and the erection of buildings thereon was begun. About the same time they filed a certificate under the Pennsylvania Fictitious Names Act, which *267 required persons doing business under a fictitious name to file a certificate showing the real parties in interest. The certificate stated that the name under which the business was being conducted was "Grange Development." During the period 1929 to 1936 extensive improvements were made on tracts 4, 5 and 6, financed by mortgages on the property, which, on May 11, 1936, totaled $308,000. In April 1936 construction was started on a two-story apartment house containing 20 apartments. This building was completed in October, 1936, financed by the trustees of the trust through a mortgage on the premises. Upon organization of the trust on May 11th, 1936, the trustees took over all of the Smith interests, including the improved tracts Nos. 4, 5 and 6 and the 149/210 fractional interest in the unimproved tracts Nos. 1, 2, and 3. The development, management, improvement and operation of the properties was continued in very much the same manner as before. A brief summary of the happenings during the taxable period may not be amiss. In September, 1936 the trustees filed a certificate under the Fictitious Names Act stating that the name under which the business was being conducted was "Grange *268 Development" and the character of the business was "Development and Management of real estate * * *." In 1938 they purchased the remaining 61/210 interest in Tract No. 1 for $17,130.73. In 1938 they constructed on this tract a two-story brick building containing six units for retail stores, with second floor apartments, at a cost of $40,800. Four of the units were sold in 1938 for a total consideration of $49,000. In 1938 they also constructed, on Tract No. 1, a brick building for the purpose of a United States post office at a cost of $26,500. This building was immediately leased to the United States Government for a term of ten years at a rental of $4,200 a year. Expenditures for repairs and improvements to buildings constructed before the trust was formed were made during the taxable period in the total amount of $64,127.78. One of the most extensive of such improvements was the enlargement of the theatre building in order to secure a more favorable rental agreement. Gross rentals received for the years 1936 to 1939 inclusive aggregated $397,608.76 and profits of the trust on tracts Nos. 1, 4, 5 and 6 for the same period, after depreciation, totaled $70,592.98. Mortgage indebtedness *269 was increased by $147,000 through borrowing and substantially reduced by application of the profits. Since but small sums were distributed to the beneficiaries the net worth of the trust has been materially increased. So much, then, for a general summary of the operations. Turning now to the language of the trust instrument it is noted that the trust is to continue for 21 years after the death of the survivor of the issue of Benjamin R. Smith living at the time it was created. When this will occur can only be surmised. We know, however, that at least one of the possible survivors - Edward Wanton Smith, Jr., - was less than 21 years of age at that time. At the end of the term the trust is to terminate and the corpus, then undistributed, is to vest in the beneficiaries. The trustees are a continuing body and the sole managers of the trust estate. The continuance of the trust is not affected by the death of the owners of beneficial interests or the transfer of such interests. The liability of the beneficiaries is limited to the property conveyed to the trust and their interest therein during the continuance of the trust is only an interest in the net income and the net proceeds of any *270 sale made by the trustees; but any distribution of net income or net proceeds from sales is at the absolute discretion of the trustees. Sales are at the discretion of the trustees. They can borrow money, encumber, lease, build, demolish, improve, reconstruct or develop the property in any way that they see fit as a proprietary project for the production of income. They can also acquire and develop adjacent property. In our judgment the foregoing facts bring this case within the rule announced by the Supreme Court in Morrissey v. Commissioner, supra, and require that Grange Trust be classified as a business association within the term "corporation" as used in the statute and so taxed. Although the purpose of a trust is to be found in the agreement of the parties, Morrissey v. Commissioner, supra; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369; Title Insurance and Trust Co. v. Commissioner, 100 Fed. (2d) 482, it may not be determined by a single excerpt or isolated phrases found therein, but must square with the whole instrument. An examination of the agreement here leads to the conclusion that the trust was created and maintained *271 as a medium for carrying on a business enterprise for profit. The fact that sometime, in the uncertain future, the trust corpus and accumulated profits will be distributed to the beneficiaries does not alter the character of the organization. "Its character was determined by the terms of the trust instrument. It was not a liquidating trust; it was still an organization for profit, and the profits were still coming in." Morrissey v. Commissioner, supra.
The salient features of a trust, making it analogous to a corporation when used as a medium for the carrying on of a business enterprise and sharing its profits, are set out by the Supreme Court in the Morrissey case. They include, an entity which holds title to the property, a centralized management, a continuing entity uninterrupted by the death of the owners of beneficial interests and unaffected by the transfer of such interests, and limitation of personal liability to property embarked in the undertaking. All of these attributes are present here. See also Swanson, et al., v. Commissioner, 296 U.S. 362; Helvering v. Coleman-Gilbert Associates, supra; Porter v. Commissioner, 130 Fed. (2d) 276; *272 Lee H. Marshall Heirs, et al., 39 B.T.A. 101, affd., 111 Fed. (2d) 935, cert. denied 311 U.S. 658. We hold that Grange Trust is an association taxable as a corporation within the meaning of the statute. The second issue is whether the statute of limitations ( Section 275, I.R.C.) bars assessment of the tax for 1936. Respondent places no reliance upon the waiver which, as shown in our findings, was filed with the Commissioner more than three years after the return was filed. Cf. White Oak Transportation Co., 24 B.T.A. 307, affirmed sub nom Commissioner v. Northern Coal Co., 62 Fed. (2d) 742, certiorari denied Helvering v. Northern Coal Co., 290 U.S. 591, entertained 292 U.S. 612, rehearing denied 293 U.S. 191. He attempts to support his determination under Section 275 (c), [3] arguing that there had been omitted from gross income an amount properly includible therein in excess of 25 per centum of the gross income stated in the return. Although the facts are not seriously in dispute they may be restated briefly. Our findings show that an aggregate of $26,513.88 *273 was included in the partnership returns. The total gross income for 1936 was $81,212.62, plus $1,931.51 rentals and parking and $4,500 interest on the Burpee mortgage. [4] The income to be reported by the trust, therefore, was $59,261.12, computed as follows: 149/210th of Rentals and Parking
($1,931.51)
$ 1,370.45
149/210th of Interest Burpee Mortgage
($4,500.00)
3,191.93
Rents
54,698.74
Total
$59,261.12
*274 In the two fiduciary returns filed by the trust - one for Grange Farm and one for Grange Development - rents in the aggregate amount of $54,698.74 were reported in Schedule B, and depreciation, repairs, taxes, expenses, etc., were deducted. There was entered on the face of the return the difference, an aggregate amount of $33,388.82. The respondent spells out of this an omission from gross income of $25,872.30 ($54,698.74 - $33,388.82+$4,563.38), which of course, is in excess of 25 per centum of the amount stated on the face of the return. Petitioner does not agree with respondent's analysis of the facts nor do we. The form was filled out in accordance with the instructions. Obviously the responsible officers of the Treasury Department, who prepared the form, had in mind that the schedule should show the actual rentals received and the legal deductions and that there should be brought onto the face of the return only the true income resulting. This, together with interest, capital gains, dividends, "Net Profit (or Loss) from Trade or Business", [5] and other income constituted the gross income of the trust. In that view, the gross income of the trust was $33,388.82 and the amount *275 omitted was not in excess of $4,563.38. If respondent is correct in his conclusion that the gross income from rents was $54,698.74 then it seems clear that petitioner is correct in asserting that the same amount was actually "stated in the return" - the language used in section 275 (c), supra. It cannot be found upon this record that petitioner had omitted from its 1936 gross income "an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return." Cases cited and relied upon by the respondent are distinguishable upon their facts. In Estate of C. P. Hale, 1 T.C. 121, the decedent had shown on Line 10 of his return a capital gain of $597.15 whereas his real capital gain was $7,388.55. In William L. E. O'Bryan, 1 T.C. 1137, affd., O'Bryan v. Commissioner, 148 Fed. (2d) 456 (March 14, 1945) the returns disclosed the amount of income received; but only one-half was included in the taxpayer's income, the balance having been included in a return filed by him for his wife, from *276 whom he had been separated for a number of years and who had agreed with him that all of his earnings were to be free from control, restraint or interference by her. In Katharine C. Ketcham, 2 T.C. 159, affd., Ketcham v. Commissioner, 142 Fed. (2d) 996, the petitioner had not included in her gross income amounts received by her under trusts created by her former husband, from whom she had been divorced. The Circuit Court of Appeals for the Second Circuit affirmed our holding that merely stating, in attached schedules, that the amounts had been received "cannot relieve her from the effect of having omitted those amounts in her gross income." In Oleta A. Ewald, 2 T.C. 384, affd., Ewald v. Commissioner, 141 Fed. (2d) 750, the petitioner had not included in gross income substantial amounts which were determined to be taxable to her under section 167 I.R.C.
The deficiency in tax for 1936, having been determined more than three years after the return was filed, is barred by section 275 (a) I.R.C. Inasmuch as section 275 (c) is not applicable the deficiency will be set aside. Since conclusion *277 has been reached that the deficiency for 1936 cannot be sustained because of the bar of the statute of limitations, the adjustment made to the net income for that year, resulting from the disallowance of a claimed deduction of $17,236.69 as taxes, under the circumstances shown by the stipulation of the parties, has become moot. The next question is whether the capital stock tax returns, filed by petitioner on September 29, 1943, for the fiscal years ending June 30, 1936, 1937, 1938 and 1939, are valid returns. On each the declared value or adjusted declared value was set out in the proper place and exemption was claimed on the ground that petitioner was a "Trust not doing business." Full explanation was made in an attached schedule, shown in our findings, in which it was stated inter alia: This return is filed for the purpose of fixing the declared value of the capital stock in the event that the pending litigation should determine Grange Trust to be liable for federal corporation taxes as an association. The return was signed and sworn to by three of the trustees. Upon determining that petitioner was an association taxable as a corporation, the respondent did not file capital *278 stock returns for it nor advise it that such returns should be filed. In computing the deficiency in excess profits taxes, he has treated petitioner as a no-capital corporation. He contends that the delinquent returns filed by it are not acceptable under the statute and applicable regulations. We think respondent is in error. In Jordan Creek Placers, 43 B.T.A. 131, it was said: "The purpose of the requirement of a capital stock tax return is not so much to advise the Commissioner of the true facts as to the taxpayer's income, as in the case of a foreign corporation, as to record the taxpayer's election of, the value to be placed on its capital stock." Here, as in the Jordan case, the failure to file capital stock tax returns when due was the result of an honest belief that petitioner was not an association taxable as a corporation and that capital stock tax returns were not required under the statute. The statute does not prohibit filing delinquent returns but in fact recognizes such in providing for penalties. Where, as here, there was an honest belief that returns were not required in order to preclude the assessment of penalties for delinquent filing, the returns *279 are not, for that reason, void, either as first returns or for excess profits tax purposes. Cf. Jordan Creek Placers, supra; Del Mar Addition v. Commissioner, 113 Fed. (2d) 410. See also Dr. Salsbury's Laboratories v. United States, 133 Fed. (2d) 641. The purpose of the statute is to allow the taxpayer to fix for itself the value of its capital stock, Haggar Co. v. Helvering, 308 U.S. 389; and, where the taxpayer fails or refuses to do so, the Commissioner may file a return for him and the taxpayer is bound by such return. Cf. Lee H. Marshall Heirs, 45 B.T.A. 632. In our opinion the returns filed were valid returns for purposes of the excess profits tax. Del Mar Addition v. Commissioner, supra. The next question is whether Grange Trust is subject to undistributed profits tax for the years 1936 and 1937. Since the deficiency in tax for 1936 has been set aside because barred by the statute of limitations we consider only 1937. In computing the deficiency for 1937 the respondent allowed a dividends paid credit of $3,000. This is the amount paid over to the beneficiaries during that year. Petitioner contends *280 that if it is taxable as an association it is entitled to a dividends paid credit equal to its entire net income and therefore that it is not subject to any undistributed profits tax. Petitioner's argument is based on the assumption that all of the net income was currently distributable to the beneficiaries. This is an erroneous assumption. The distribution of income is controlled by the trust instrument. Under it no net income is distributable to the beneficiaries currently except at the discretion of the trustees. The fact that a statement was submitted to the beneficiaries at the end of each year, showing the total net income and the portion allocable to each beneficial interest, is not controlling in view of the express provisions of the trust instrument. Section 27 of the Revenue Act of 1936 provides that only income actually distributed may be allowed as a dividend paid credit to corporations. Since only $3,000 was distributed in 1937 the dividend paid credit must be limited to that amount. The final issue stems from respondent's failure to allow any dividends paid credit for the reduction of petitioner's mortgage indebtedness in computing the deficiency for 1938. He added *281 to the income of $21,052.74, disclosed by petitioner's return, net capital gain in the amount of $9,424.56, making a total adjusted net income of $30,477.50. This adjustment is not contested by petitioner. Section 13 (b) of the Revenue Act of 1938 provides for a tax on the net income of every corporation, the net income of which is more than $25,000, to be "computed under subsection (c) of this section, or a tax computed under subsection (d) of this section, whichever tax is the lesser." Subsections (c) and (d) provide: (c) GENERAL RULE. - The tax computed under this subsection shall be as follows: (1) A tentative tax shall first be computed equal to 19 per centum of the adjusted net income. (2) The tax shall be the tentative tax reduced by the sum of - (A) 16 1/2 per centum of the credit for dividends received provided in section 26 (b); and (B) 2 1/2 per centum of the dividends paid credit provided in section 27, but not to exceed 2 1/2 per centum of the adjusted net income. (d) ALTERNATIVE TAX (Corporations With Net Income Slightly More Than $25,000). - (1) If no portion of the gross income consists of interest allowed as a credit by section 26 (a) (relating to interest *282 on certain obligations of the United States and Government corporations), or of dividends of the class with respect to which credit is allowed by section 26 (b), then the tax computed under this subsection shall be equal to $3,525, plus 32 per centum of the amount of the net income in excess of $25,000. Respondent computed the tax for the year 1938 under section 13 (d) (1), as a corporation "with net income slightly more than $25,000", instead of section 13 (c) under which 2 1/2 percent of the dividends paid credit provided in section 27, Revenue Act of 1928, would have been allowed. In the recomputation under this decision the tax shall be computed under section 13 (c) and section 13 (d) (1), supra, and whichever is the lesser will be approved for assessment. Decision will be entered under Rule 50. Footnotes
1. Each of the parties, with commendable thoroughness, has summarized all of the stipulated and evidentiary facts in a statement of facts and request for findings. Many of the findings are couched in almost identical language. Such differences as exist are largely matters of interpretation of terms - in some instances one party has placed especial emphasis upon a paragraph, sentence or word while the other insists the emphasis should be placed elsewhere. In the main the parties are in accord upon all of the historical facts. They are not set out in extenso in our findings but have been given due consideration.↩
2. This is a copy of the stipulation. It is noted, however, that the aggregate is only 91/105ths. The discrepancy seems to be immaterial to the issues to be decided.↩
*. 12 months.↩
3. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) GENERAL RULE. - The amount of income taxes imposed by this title shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * * * *
(c) OMISSION FROM GROSS INCOME. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. ↩
4. It is doubtful if any part of the interest on this mortgage is includible in the income of the trust since it has been stipulated that the mortgage was not transferred to the trust and has, at no time, constituted a part of its corpus. The question need not be decided since, in our view, the omitted income is less than the 25 per centum referred to in section 275 (c)↩ of the applicable act even if the interest is included.
5. The quotation is Line 1 on the Fiduciary form, followed by the parenthetical phrase "From Schedule A."↩